# FLORIDA ASSOCIATION OF BLOOD BANKS, INC., etc., et al. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, STATE OF FLORIDA

Case No. 85-3141R

State of Florida, Division of Administrative Hearings

December 18, 1986

## APPEARANCES OF COUNSEL

**Thomas J. Gilday** for petitioners.

**Michael O. Mathis** for respondent.

## OPINION

LINDA M. RIGOT, Hearing Officer.

### FINAL ORDER

Pursuant to Notice, this cause was heard by Linda M. Rigot, the

assigned Hearing Officer of the Division of Administrative Hearings, on August 26, 1986, in Tallahassee, Florida.

Petitioners Florida Association of Blood Banks, Inc.; Leon County Blood Blank, Inc.; Jacksonville Blood Bank, Inc.; and Southwest Florida Blood Bank, Inc. were represented by Thomas J. Gilday, Esquire, Tallahassee, Florida; and the Respondent Department of Health and Rehabilitative Services was represented by Michael O. Mathis, Esquire, Jacksonville, Florida.

Petitioners Florida Association of Blood Banks, Inc.; Leon County Blood Bank, Inc.; Jacksonville Blood Bank, Inc.; and Southwest Florida Blood Bank, Inc. filed a Petition pursuant to Section 120.56, *Florida Statutes,* challenging the validity of Rule 10D-41.66(19), *Florida Administrative Code,* a rule promulgated by the Department of Health and Rehabilitative Services. Petitioners contend that the Rule is arbitrary and capricious, is an invalid exercise of delegated legislative authority, and is contrary to the language and plain meaning of Section 483.172(5), *Florida Statutes.* Petitioners assert that they are being required to pay licensure fees improperly to the Department for facilities referred to as transfusion services which they operate in various locations. Petitioners contend that although a separate license for each of the facilities is proper, Section 483.172(5), *Florida Statutes,* precludes the collection of a separate licensure *fee* for these facilities. Petitioners contend that the Department's definition by the challenged Rule of "Transfusion Service" is arbitrary, "absurd", and modifies improperly Section 483.172(5), *Florida Statutes.*

Petitioners presented the testimony of Dr. Paul J. Schmidt and Dr. Dale Malloy. Additionally, Petitioners' Exhibits numbers 105, 7-10, 12, 14 and 15 were admitted in evidence.

Respondent presented the testimony of Dr. Patricia Johns, Laura Phillips, and by way of deposition Dr. Francisco Civantos. Additionally, Respondent's Exhibits numbers 1, 2, 5-7, and 10-13 were admitted in evidence.

Both parties submitted post hearing proposed findings of fact in the form of proposed final orders. Petitioners' proposed findings of fact numbered 2, 3 and 5-16 have been adopted either verbatim or in substance in this Final Order but Petitioners' proposed findings of fact numbered 1 and 4 have been rejected as not being supported by any evidence. Respondent's proposed findings of fact numbered 19 and 25 have been adopted in substance in this Final Order. The remainder of Respondent's proposed findings of fact have been rejected as follows: 1-11, 15-17, 20, 26 and 27 as not constituting findings of fact but rather

as constituting conclusions of law or argument of counsel; 12-14, 24, 28, 30, 31, 33 and 34 as being irrelevant; 18, 21-23, 29, 32 and 36 as being contrary to the weight of the credible evidence; and 35 as being meaningless.

## FINDINGS OF FACT

1. Southwest Florida Blood Bank, Inc., is a nonprofit community blood bank operating principally in the Tampa Bay Area. It operates a number of facilities known as "transfusion services" in hospitals in the Tampa Bay Area. It has paid separate licensure fees for three of these facilities.

2. Leon County Blood Bank, Inc., is a nonprofit community blood bank operating in Leon County, Florida. It operates several facilities known as "transfusion services" within the County. It has been required to pay separate licensure fees for one of these facilities.

3. No evidence was presented to Petitioner Jacksonville Blood Bank, Inc.

4. No evidence was presented as to Petitioner Florida Association of Blood Banks, Inc., although the parties did stipulate that it is a trade group which develops professional standards.

5. "Blood banking" is an activity which involves administrative and medical functions in making available for transfusion to patients human blood and blood components. The operational procedures of a blood bank typically involve recruiting activities to attract volunteer donors. These donors are screened, questioned, and evaluated for suitability. If suitable, a blood donation is voluntarily obtained. Screening and collection procedures involve performance of a hematocrit, hemoglobin and blood typing. These procedures are clinical laboratory procedures subject to regulation under Chapter 483, *Florida Statutes.* They provide information about the health of the prospective donor and the suitability of blood for ultimate transfusion. Blood is typically collected at either the principal blood bank facility or at remote collection stations sometimes referred to as branch offices or mobile donor units. Blood is infrequently collected at facilities known as transfusion services.

6. Once the blood is collected, it is processed using a variety of test procedures including antibody screens, serologic tests, and other procedures to determine the suitabiity of blood for storage prior to a need for ultimate transfusion. Human blood can be and is

frequently separated into various blood components. Separation into components can occur before or after various test procedures are performed. Once the blood or components have been completely processed, the label is identified as to blood type and immunohematologic properties. The blood is then stored until it is needed for transfusion. All of these procedures typically occur in the principal blood bank facilities and are referred to as processing.

7. Before blood can be transfused to a patient, further procedures must be performed. When a physician orders blood or a blood component for transfusion to a patient, a sample must first be obtained from the intended patient/recipient. The patient's sample is then mixed with a sample of blood or blood component obtained by donation in order to test compatibility. This procedure is known as a crossmatch. If the blood is determined to be compatible, then it is provided to the hospital for transfusion to the patient/recipient. The hospital will then either transfuse the blood or store it awaiting transfusion. Crossmatch procedures are often performed in the principal blood bank facility. However, they are also performed in facilities known as "transfusion services" located in hospitals. These facilities are operated both by hospitals and blood banks.

8. Blood collection is usually performed in the principal blood bank, a collection station branch office or a mobile donor unit. Processing is typically done at a central location. Blood banks frequently rent or lease space in hospitals in which they operate facilities referred to as "transfusion services." These facilities have the capacity to store limited amounts of blood and to perform crossmatch procedures when blood or a blood component is requested for transfusion to a patient/recipient.

9. A "collection station" is a remote location in which the only activity is the collection of blood from donors.

10. The Southwest Florida Blood Bank (hereinafter "SWFBB") operates multiple locations in which it collects blood. It also operates four mobile donor units. The SWFBB performs the majority of its procedures at its principal location near the University of South Florida. This facility is licensed by the Department and a licensure fee is paid. SWFBB leases or rents space in hospitals at Tampa General Hospital, St. Joseph's Hospital, Humana-Brandon Hospital and a new facility known as Women's Hospital. It performs crossmatch procedures at each

of these locations. The Department has required separate licensure and payment of a separate fee for each facility. SWFBB also provides blood and blood components to a number of hospitals in which the hospital performs the crossmatching.

11. The Leon County Blood Bank (hereinafter "LCBB") performs crossmatch and compatibility testing at its principal location for blood supplied to hospitals. LCBB also leases or rents space at Tallahassee Memorial Hospital and Tallahassee Community Hospital where it provides personnel to perform crossmatch and compatibility testing procedures within the hospital. The Department requires separate licenses and payment of separate fees for facilities located at Leon County Blood Bank and Tallahassee Community Hospital. (It does not charge a separate fee for the facility located within Tallahassee Memorial Hospital because LCBB is located on property adjacent to the hospital, but it does require separate licensure.) The LCBB also provides blood to hospitals in nearby counties where the hospital operates a transfusion service to perform the crossmatch.

12. The Department has defined the activities which is considers to be a "transfusion service." They include the performance of therapeutic pheresis; preparation of red blood cells; recovery of human plasma; and collection of blood. According to the Department, these activities do not require licensure. However, activities involving crossmatching, prenatal immunohematology procedures or other procedures for therapeutic administration of blood or blood components are considered to be clinical laboratory procedures and require a separate license. Hence, they are not activities of a "transfusion service" according to the Department. The separation of activity the Department has established fails to comport with any breakdown recognized or applied in the medical, blood bank or hospital industry. All witnesses who testified indicated that a "transfusion service" has always included the activity of crossmatching or compatibility testing of blood. Dr. Paul Schmidt, a preeminent national authority in blood banking with over thirty years experience, testified "transfusion service" has always included the activity of crossmatching. This was confirmed by Dr. Malloy who has been involved in both national and state blood banking for over twenty years. Their understanding is further confirmed by the Department's own witness, Laura Phillips, who was responsible for promulgation of the challenged rule.

13. No witness who testified could identify a single instance in which

a "transfusion service" operates in the manner of the activities broken down by the Department in its rule under challenge in this cause.

14. The Department's exclusion of crossmatching procedures from the definition of "transfusion service" contradicts the historical meaning of the term and the functional breakdown of activities which exist and have always existed in the industry. Dr. Schmidt and Dr. Malloy testified without contradiction that a transfusion service does not collect blood. Furthermore, neither is aware of any transfusion service which has ever been involved in continuous blood collection. The Department offered no evidence of a facility which engages in such activity. Both Dr. Schmidt and Dr. Malloy admitted that preparation of red blood cells and recovery of human plasma could be done in a transfusion service, but that these activities as a matter of practice were generally done in a blood collection and processing facility. Neither is aware of any entity or facility which has performed the various functions which the Department attributes to a transfusion service in their rule. The Department has never attempted to ascertain whether facilities exist which meet the definition contained within their rule. The only facilities which the Department could identify as meeting their definition were "collection stations or mobile units."

15. Finally, the testimony is uncontradicted that crossmatching is inherently a function of a "transfusion service."

16. Authoritative medical and industry standards as well as state and federal regulations uniformly include the function of crossmatching within the activities performed by a "transfusion service." The American Association of Blood Banks Standards, which are the most comprehensive recognized standards existing within the United States and perhaps the world, define and refer to a transfusion service as including the functions of "storing, crossmatching and issuing blood for transfusion." These standards are applied by organizations such as the Joint Commission on Accreditation of Hospitals and the College of American Pathologists in defining hospital practice and inspection procedures. The Department itself uses these standards. It has entered into an agreement for alternate-year inspections of blood banks and transfusion services with the AABB which adopts the AABB standards and guidelines, including the definition of a "transfusion service." The federal Health Care Financing Administration has adopted a definition for "transfusion services"

**185**

which includes the crossmatching and compatibility testing of blood. The federal Food and Drug Administration also defines transfusion services as involving compatibility testing. More importantly, the Department has been delegated inspection responsibilities under federal regulations and pursuant to federal regulations in determining qualifications for Medicare reimbursement certification.

17. Finally, the Department's own survey reports contain reference to "transfusion service" in the context of procedures which include activities involving crossmatching and compatibility testing. The Department acknowledges that its rule definition of "transfusion service" is inconsistent with federal regulations as well as their own practices and procedures.

18. The Department justifies its rule distinction between those activities which are referred to as a "transfusion service" and those activities which are not and require licensure and payment of a separate fee, by claiming that certain activities performed by "transfusion services" are not "clinical laboratory procedures."[1] However, even this explanation is contradicted by the evidence. The testimony is uncontradicted that collection of blood involves performance of procedures known as hematocrit, hemoglobin and blood typing. These procedures are acknowledged to be clinical laboratory procedures. Hence, under the Department's own analysis, a "transfusion service" performing collection of blood would be a clinical laboratory and thus fail the Department's rule definition.

19. The Department has required payment by SWFBB and LCBB of licensure fees for facilities which each leases or rents at hospitals where the principal activity is the crossmatching and storing of blood of transfusion. The most recent separate fee charge for each of these facilities is $750.00 per year per facility.

20. The Department is not able to cite any authority, standard or state or federal regulation consistent with its definition of transfusion services. It is unable to identify any facility which has met, or in the future would meet, its definition.

21. Petitioners have stipulated that transfusion services are a kind of clinical laboratory and are thus subject to separate licensure as a clinical laboratory.

---

[1] Unquestionably, the performance of crossmatching and compatibility testing are clinical laboratory procedures.

186

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the parties hereto and the subject matter hereof. Section 120.56, *Florida Statutes.*

Although Petitioners Florida Association of Blood Banks and Jacksonville Blood Bank, Inc., clearly asserted their standing to initiate this proceeding in their pleadings filed in this cause, they presented no evidence as to their standing and have, therefore, failed to meet their burden of proving their standing in this proceeding. They are, therefore, hereby dismissed as parties herein. On the other hand, Petitioners Leon County Blood Bank, Inc. and Southwest Florida Blood Bank, Inc. have proven that they have interests which are substantially affected by the Department's rule definition of transfusion service in that they are paying multiple licensure fees pursuant to the rule under challenge herein. They have, therefore, proven their standing in this proceeding.

Contrary to the Department's assertion in its pleadings and by virtue of its evidence at the final hearing in this cause that the issues herein involve whether transfusion services perform clinical laboratory procedures and are therefore clinical laboratories subject to licensure by the Department, that is simply not the issue. Petitioners have stipulated that transfusion services are clinical laboratories and must therefore be separately licensed. The only real issue in this case is whether Petitioners' transfusion services must pay a separate licensure *fee.* The answer to that question is statutorily clear. Part I of Chapter 483, *Florida Statutes,* is entitled The Florida Clinical Laboratory Law, Section 483.172, *Florida Statutes,* provides, in pertinent part, as follows:

> The department shall collect fees for all licenses issued under this part. . . . The fee schedule is as follows:
>
> . . . . . . . . . . . .
>
> (5) For licensure as a clinical laboratory, an annual fee of not less than $210 or more than $1,000. *No separate licensure fee shall be paid by any branch office, mobile donor unit, or transfusion service operated by a blood bank when the principal location of the blood bank is licensed under this part* . . . . [Emphasis added.]

It is clear, then, that the legislature has provided an exemption from the payment of a separate licensure fee to any branch office, mobile donor unit, or transfusion service operated by a blood bank when the principal location of the blood bank is licensed under The Florida Clinical Laboratory Law. Since the principal locations of both LCBB

and SWFBB are licensed pursuant to The Florida Clinical Laboratory Law, transfusion services operated by them, while needing a separate license, are exempt from payment of a separate licensure fee.

Effective June 6, 1985, the Department promulgated as a rule Section 10D-41.66(19), *Florida Administrative Code,* which defines a transfusion service as follows:

(19) Transfusion Service—for purposes of this part, a blood bank transfusion service shall include the collection of blood and blood components, performance of therapeutic collection or pheresis, preparation of red blood cells and the recovery of human plasma. Blood Banks offering only these services shall not be required to obtain a license. Facilities where crossmatching, prenatal immunohematology procedures or other procedures required for therapeutic administration of blood or blood products are performed shall be considered a clinical laboratory and shall be required to obtain a license.

In its allegedly "functional analysis" definition, the Department has defined a transfusion service to be an entity which performs four functions not normally performed by transfusion services. On the other hand, the rule defines a facility which performs the one function always performed by a transfusion service—compatibility testing or crossmatching—to *not* be a transfusion service. The rule, therefore, contradicts all historical regulatory and practical definitions of a transfusion service. Although the rule only speaks to licensure and not the payment of licensure fees, the Department uses its definition of transfusion service for purpose of licensure as its basis for the collection of a separate fee for transfusion services operated by licensed blood banks, contrary to the plain language contained in the statutory exemption. In other words, as argued by Petitioners at the final hearing, the Department took what was historically known to be a cow and defined it to be a non-cow while defining what was historically a non-cow to be a cow. It is obvious that such cannot be done.

By its rule, the Department has repealed the exemption from payment of separate licensure fees for transfusion services contained in Section 483.172(5), *Florida Statutes,* in that it has adopted a definition of transfusion service contrary to its plain and unambiguous meaning. It is, therefore, clearly an invalid exercise of delegated legislative authority. It is axiomatic that administrative rules cannot enlarge, modify, or contravene the provisions of a statute. A rule which purports to do so constitutes an invalid exercise of delegated legislative authority. *Department of Business Regulation v. Salvation Limited,*

188

*Inc.*, 452 So.2d 65 (Fla. 1st DCA 1984). Since the Legislature did not specifically define transfusion service, it is clear that the Legislature intended for the term to be given its plain and unambiguous meaning. The testimony is uncontradicted as to the historical and present meaning of transfusion service. It has always included the activity of crossmatching.

The rule under challenge herein does not identify any entity which is known to exist in the medical, hospital or blood banking industry. It modifies the statute by providing that facilities which perform cross-matching procedures and are, therefore, transfusion services are not transfusion services and therefore must pay a separate fee. Incongruously, facilities which do *not* perform crossmatching procedures are considered transfusion services and therefore are exempt from payment of the fee. Thus, the Department has not only added a qualification to the statutory definition but has applied that qualification contrary to the common understanding and statutory use of that term.

Rules that reasonably relate to the purposes of the enabling legislation should be sustained. *Grove Isle, Limited v. Department of Environmental Regulation,* 454 So.2d 571 (Fla. 1st DCA 1984). Although Section 483.051, *Florida Statutes,* authorizes the Department to adopt rules to implement The Florida Clinical Laboratory Law, it is clear that the Legislature did not authorize the Department to adopt rules that would repeal the statutes enacted by the Legislature. Rule 10D-41.66(19) is, therefore, not authorized since "the purpose of the enabling legislation" is not carried out by that rule; rather, that rule in its effect repeals the statutory exemption granted to transfusion services under certain circumstances from the payment of separate fees.

The lack of reasoning and the arbitrary and capricious nature of the rule in question is glaringly apparent. The Department has defined the term transfusion service so as to exclude the very activity (crossmatching) which has uniformly been understood to be essential in operating a transfusion service. The Department admits that its own definition does not apply to any entity which it is able to identify. Further, uncontradicted testimony indicates that no facility would organize its activities so as to fall within the functional definition created by the Department. The Department's definition contravenes not only recognized industry standards but also federal regulatory standards which the Department has not only adopted but is required to enforce. The Department is unable to offer any credible or logical explanation for its definition. The apparent reason for the definition appears to be solely to collect additional licensure fees regardless of whether the collection of such fees has been authorized by the Legislature. Lastly, the Departments

admits that the only facilities which it can identify which fall within its definition of transfusion services are certain collection stations. Since collection stations are defined by Section 483.041(5), *Florida Statutes,* it is obvious the Legislature did not intend a transfusion service to have the same meaning as a collection station.

The Department presents one additional confusing argument that the entities granted the statutory exemption from payment of a separate fee in Section 483.172(5), *Florida Statutes*—branch offices, mobile donor units, or transfusion services—are entities that are not clinical laboratories and, therefore, transfusion services must be defined in a way that it will not be considered a clinical laboratory subject to licensure. That argument is another attempt by the Department to change the issue in this case from the real issue of payment of a licensure fee to the non-issue of whether a license is required for those entities. While it is true that mobile donor units and branch offices do not perform compatibility testing and crossmatching, the evidence is uncontradicted that they do perform procedures known as hematocrits, hemoglobins and blood typing which are clinical laboratory procedures (as is compatibility testing). Therefore, all three entities granted the exemption from a separate licensure fee are in fact clinical laboratories subject to clinical laboratory licensure. Additionally, the Department's argument is illogical. If, as the Department contends, these entities are non-clinical laboratories, one can only wonder why the Department requires them to be licensed as clinical laboratories in order that they can have collected the separate licensure fees which they have been collecting from Petitioners and others.

Petitioners have plead and proven that the separate licensure fees collected by the Department pursuant to its rule definition have been paid under protest and continue to be paid under protest. Concomitantly, the Department has collected those separate licensure fees at its own jeopardy in view of the clear and plain language contained in Section 483.172(5), *Florida Statutes.* Although it is recommended that the Department remit all separate licensure fees paid to it by any branch office, mobile donor unit, or transfusion service operated by a blood bank whose principal location is licensed, the undersigned is without authority to order the Department to do so since that authority is reserved to other forums.

Based upon the foregoing findings of fact and conclusions of law, it is, therefore,

ORDERED THAT:

(1) Leon County Blood Bank, Inc. and Southwest Florida Blood Bank, Inc. have standing to maintain this action;

(2) Rule 10D-41.66(19), *Florida Administrative Code,* is an invalid exercise of delegated legislative authority; and

DONE and ENTERED this 18th day of December, 1986, Tallahassee, Florida.